1

2

3

4

Jon B. Fougner (State Bar No. 314097)
jon@fougnerlaw.com
600 California Street, 11th Floor
San Francisco, California 94108
Telephone: (415) 577-5829
Facsimile: (206) 338-0783

5

[Additional counsel appear on signature page]

6

7

*Attorneys for Plaintiffs Louis Floyd and Terry
Fabricant and the Proposed Class*

8

9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

10

11

12

13

14

15

16

17

18

19

20

21

22

| | |
|---|---|
| LOUIS FLOYD and TERRY FABRICANT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FIRST DATA MERCHANT SERVICES LLC,<br><br>SAM'S CLUB MERCHANT SERVICES,<br><br>NATIONAL PAYMENT SYSTEMS LLC, and<br><br>NATIONAL PAYMENT SYSTEMS OR, LLC d/b/a/ ONE CONNECT PROCESSING,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR INJUNCTION AND DAMAGES**<br><br>**Class Action**<br><br>**JURY TRIAL DEMAND** |

23

24

25

26

27

Plaintiffs Louis Floyd and Terry Fabricant, by their undersigned counsel, for this class

action complaint against Defendants First Data Merchant Services LLC ("First Data"), Sam's

Club Merchant Services, National Payment Systems LLC ("National Payment Systems"),

National Payment Systems OR, LLC d/b/a One Connect Processing ("One Connect" or "One

28

Connect Processing"), and their present, former, and future direct and indirect parents, subsidiaries, affiliates, agents, and related entities, allege as follows:

## I. INTRODUCTION

1. This case arises from Defendants' unsolicited telemarketing to Plaintiffs in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive calling practices, *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 371 (2012).

2. The telemarketing was conducted using an automated telephone dialing system ("ATDS") and prerecorded messages, tactics among those that inspired Congress to enact the TCPA and that most infuriate Americans to this day.

3. The telemarketing targeted, among other phone lines, cellular telephones and numbers listed on the National Do Not Call Registry ("NDNCR").

4. Automated telemarketing campaigns generally place calls to hundreds of thousands or even millions of potential customers *en masse*, and Plaintiffs bring this action on behalf of a proposed class of persons—defined more specifically herein—who received such calls promoting First Data or Sam's Club Merchant Services.

5. According to First Data, it hired no third party to telemarket to Plaintiffs and the proposed class members other than National Payment Systems, which worked with its subsidiary One Connect Processing to place the calls.

6. Plaintiffs and proposed class members did not provide prior express written consent to receive these calls.

7. Defendants' telemarketing has continued despite prior TCPA litigation asking that it stop.

## II. PARTIES

8. Mr. Floyd is a natural person.

9. Mr. Floyd is a "person" within the meaning of 47 U.S.C. § 153(39).

10. Mr. Floyd resides in Campbell, California.

11. Mr. Fabricant is natural person.

12. Mr. Fabricant is a "person" within the meaning of 47 U.S.C. § 153(39).

13. Mr. Fabricant resides in California.

14. First Data is a Florida limited liability company.

15. First Data's principal place of business is 5565 Glenridge Connector NE, Suite 2000, Atlanta, Georgia 30342.

16. First Data's registered agent is Corporation Service Company, which has offices at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092 and 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

17. First Data is registered with the California Secretary of State to do business in California.

18. First Data does business throughout the United States, including in California, in this District.

19. Sam's Club Merchant Services purports to be a subsidiary of First Data Corporation.

20. On information and belief, Sam's Club Merchant Services' principal place of business is 5565 Glenridge Connector NE, Suite 2000, Atlanta, Georgia 30342.

21. On information and belief, Sam's Club Merchant Services' registered agent is Corporation Service Company, which has offices at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092 and 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

22. No business is registered with the Georgia Secretary of State to do business in Georgia as "Sam's Club Merchant Services."

23. No business is registered with the California Secretary of State to do business in California as "Sam's Club Merchant Services."

24. Sam's Club Merchant Services does business throughout the United States, including in California, in this District.

25. National Payment Systems is a Wyoming limited liability company.

26. National Payment Systems' principal place of business is 1920 Thomas Avenue, Suite 610, Cheyenne, Wyoming 82001.

27. National Payment Systems' registered agent is Unisearch, Inc., which has offices at 1920 Thomas Avenue, Suite 610, Cheyenne, Wyoming 82001 and 4 Venture, Suite 280, Irvine, California 92618.

28. National Payment Systems is registered with the California Secretary of State to do business in California.

29. National Payment Systems does business throughout the United States, including in California, in this District.

30. One Connect Processing is an Oregon limited liability company.

31. One Connect Processing asserts that its principal place of business is 1050 SW 6th Avenue, Suite 1100, Portland, Oregon 97204.

32. One Connect Processing does business throughout the United States, including in California, in this District.

### III.    JURISDICTION AND VENUE

33. This Court has personal jurisdiction over Defendants because they purposefully directed their activities into California by calling Plaintiffs (Californians), while Plaintiffs were in California, at their phone numbers, which bear California area codes, and because Plaintiffs' claims arise from those activities.

34. Jurisdiction: This Court has federal-question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims*, 565 U.S. at 372.

35. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to Plaintiffs' claims—namely, Mr. Floyd's receipt of the challenged telemarketing—occurred in this District.  Moreover, Mr. Floyd received the telemarketing at a phone number bearing an area code from within this District.

36. Intradistrict Assignment: Assignment to this Division is proper pursuant to Civil Local Rule 3-2(c) because a substantial part of the events or omissions that give rise to Plaintiffs' claims—namely, Mr. Floyd's receipt of the challenged telemarketing—occurred in this Division. Moreover, Mr. Floyd received the telemarketing at a phone number bearing an area code from within this Division.

## IV.    FACTS

**A.    The Enactment of the TCPA and the FCC's Regulations Thereunder**

37. Enacted in 1991, the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service."  47 U.S.C. § 227(b)(1).

38. Calls made by an ATDS or with an artificial or prerecorded voice are referred to as "robocalls" by the Federal Communications Commission ("FCC") and herein.

39. Encouraging people to hold robocallers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls.  47 U.S.C. § 227(b)(3).

40. In enacting the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy."  Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10).

41. Congress continued: "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion."  *Id.* § 2(12).

42. The TCPA's sponsor described computerized calls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall."  *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1044 (9th Cir. 2018).

43. According to findings by the FCC, which Congress vested with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live-solicitation calls and can be costly and inconvenient.

44. The FCC has made clear that "prior express written consent" is required before making telemarketing robocalls to wireless numbers. Specifically, it ordered:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

*In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted).

45. Additionally, the TCPA outlaws unsolicited telemarketing (robocalls or otherwise) to phone numbers on the NDNCR.  47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).  Encouraging people to hold telemarketers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls.  47 U.S.C. § 227(c)(5).

**B.     The Worsening Problem of Robocalls and Spam Texts**

46. Unfortunately, the problems Congress identified in 1991 have only grown worse in recent years.

47. "Month after month, unwanted [communications], both telemarketing and informational, top the list of consumer complaints received by the [Federal Communications] Commission." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7991 ¶ 1 (2015).

48. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC Chairman).

49. "The FTC receives more complaints about unwanted calls than all other complaints combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer

Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Notice of Proposed Rulemaking*, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016), *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf.

50. "During the past fiscal year, the FTC continued to receive many consumer complaints about telemarketing robocalls." Federal Trade Commission, *FTC Releases FY 2019 National Do Not Call Registry Data Book* (Oct. 17, 2019), https://www.ftc.gov/news-events/press-releases/2019/10/ftc-releases-fy-2019-national-do-not-call-registry-data-book (noting the FTC's receipt of 3.8 million complaints about robocalls in its fiscal year 2019).

51. Like other newspapers, *The New York Times* has been writing and reporting on the exploding number of robocall complaints filed by consumers and widespread consumer outrage about illegal telemarketing. Gail Collins, *Let's Destroy Robocalls*, N.Y. Times (Mar. 1, 2019), https://www.nytimes.com/2019/03/01/opinion/robocall-scams.html; Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html.

52. The harm from of illegal robocalls is "is at least $3 billion per year from lost time alone." Babette Boliek & Eric Burger, *Beating Back Unwanted Robocalls*, FCC (June 5, 2019), https://www.fcc.gov/news-events/blog/2019/06/05/beating-back-unwanted-robocalls (statement of FCC Chief Economist and FCC Chief Technology Officer).

53. In fact, the wasted hours exceed such time lost outright, because "little surges of the stress hormone cortisol" from interruptions from smartphones result in elevated heart rates, sweaty hands, tightened muscles, anxiety, and distraction, a "switch cost" that weighs on a person even after the interruption ends, reducing his or her efficiency by 40%. Stephanie Stahl, *Constant Interruptions from Smartphone Can Impact Brain Chemistry, Scientists Say*, CBS Philly (May 29, 2018), https://philadelphia.cbslocal.com/2018/05/29/scientists-constant-interruptions-smartphone-impact-brain-chemistry/.

54. Robocalls are overwhelming hospitals and patients, threatening a new kind of health crisis. Tony Romm, *Robocalls Are Overwhelming Hospitals and Patients, Threatening a New Kind of Health Crisis*, Wash. Post (June 17, 2019), https://www.washingtonpost.com/technology/2019/06/17/robocalls-are-overwhelming-hospitals-patients-threatening-new-kind-health-crisis/.

55. According to a respected robocall-monitoring firm, robocalls have quintupled over the last four years: from nine billion in the last three quarters of 2015 to 43 billion in the last three quarters of 2019.  YouMail, *Historical Robocalls by Time*, https://robocallindex.com/history/time/ (last visited Mar. 27, 2020).

56. Of the 59 billion robocalls made in 2019, YouMail reports that most were telemarketing or scams.

57. Recognizing that the havoc wreaked by unwanted robocalls is spiraling out of control, Congress recently passed, and the President signed into law, legislation strengthening the TCPA. Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act ("TRACED Act"), 116 Pub. L. No. 105, 133 Stat. 3274 (amending 47 U.S.C. § 227).

C. **Defendants' Role in This Growing Problem**

58. Defendants call numbers even though they are assigned to cellular telephone services.

59. Defendants call numbers even though they are listed on the NDNCR.

60. Defendants call using an ATDS.

61. Defendants call using prerecorded messages.

62. Recipients of these calls, including Plaintiffs and proposed class members, had not provided prior express written consent to receive them.

63. Defendants' calls at issue were not necessitated by an emergency.

64. Defendants' calls at issue were made to numbers within the United States.

65. Violating the TCPA is profitable for Defendants.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D.   A Prior Lawsuit asked First Data, National Payment Systems, and One Connect to Stop Making Telemarketing Robocalls without Consent.**

66. On March 13, 2019, Blake Cooley sued First Data and One Connect under the TCPA for unsolicited, automated telemarketing to his NDNCR-registered cellular telephone.  Compl. – Class Action ¶¶ 25-38, *Cooley v. First Data Merchant Servs., LLC*, Case No. 1:19-cv-01185-TWT (N.D. Ga. Mar. 13, 2019), ECF No. 1.  He sought an injunction prohibiting them from continuing their automated and prerecorded telemarketing.  *Id.* at 16.

67. One Connect had called Mr. Cooley on December 26, 2018.  First Am. Compl. – Class Action ¶ 30, *Cooley v. First Data Merchant Servs., LLC*, Case No. 1:19-cv-01185-TWT (N.D. Ga. Apr. 26, 2019), ECF No. 11.

68. When he answered, there was a distinctive click and pause.  *Id.* at ¶¶ 31-32.

69. Mr. Cooley said "hello" several times and then a prerecorded message played.  *Id.* at ¶ 36.

70. A One Connect representative spoke with Mr. Cooley and offered him First Data services.  *Id.* at ¶ 38.

71. She then sent him an application for First Data services.  *Id.* at ¶ 39.

72. Mr. Cooley was not a customer of any of the defendants and had not consented to receive their telemarketing.  *Id.* at ¶ 41.

**E.   Despite the *Cooley* Litigation, Mr. Floyd Was Repeatedly Robocalled.**

73. Mr. Floyd's telephone number beginning "(408) 984" is registered to a cellular telephone service.

74. That number has been registered on the National Do Not Call Registry since March 18, 2006.

75. Even after being served with process in *Cooley*, First Data kept up its telemarketing; on its behalf, National Payment Systems had One Connect Processing call Mr. Floyd at that number on April 24, 2019.

76. When Mr. Floyd answered the call, there was a distinctive click and a pause.

77. Mr. Floyd was not greeted by a live human.

78. Instead, a series of prerecorded messages played.

79. "Jacob" from One Connect spoke with Mr. Floyd and offered him First Data services.

80. During the call, One Connect sent Mr. Floyd an email with an attached application for First Data's products.  However, the salesperson abruptly hung up on Mr. Floyd and blocked Mr. Floyd from continuing to access a cloud-based version of the First Data application.

81. The application listed as "Processor" "First Data Merchant Services LLC."

82. The application listed as a "Servicer" "First Data Merchant Services LLC."

83. The application contemplated an agreement between Mr. Floyd and "First Data Merchant Services LLC."

84. The application included a proposed "Equipment Lease Agreement" contemplating an agreement between Mr. Floyd and "First Data Merchant Services LLC."

85. Mr. Floyd's telephone number beginning "(510) 429" is registered to a cellular telephone service.

86. That number has been registered on the National Do Not Call Registry since March 18, 2006.

87. On First Data's behalf, National Payment Systems had One Connect Processing call Mr. Floyd at that number on August 12, 2019.

88. The caller transmitted the caller ID (858) 216-8458.

89. When Mr. Floyd answered the call, there was a distinctive click and a pause.

90. Mr. Floyd was not greeted by a live human.

91. Instead, a series of prerecorded messages played.

92. "Skylar Westerman" from One Connect spoke with Mr. Floyd and offered him First Data services.

93. During the call, One Connect sent Mr. Floyd an email with an attached application for First Data's products.

94. Mr. Floyd is not a customer of any of Defendants and has not consented to receive their telemarketing.

**F.      Despite the *Cooley* Litigation, Mr. Fabricant Was Robocalled.**

95. Even after the *Cooley* case had been pending for at least six months, National Payment Systems had One Connect Processing robocall Mr. Fabricant on October 24, 2019.

96. Mr. Fabricant's telephone number, which begins "(818) 266", is registered to a cellular telephone service.

97. When Mr. Fabricant answered the call, there was a distinctive click and a pause.

98. After that, a recorded voice played, discussing reducing one's processing fee.

99. Mr. Fabricant had to press a number in order to respond to the prerecorded message and identify who was making the calls.

100.     After that, Jermaine Brown from One Connect spoke with Mr. Fabricant and offered him services from Sam's Club Merchant Services.

101.     Mr. Fabricant then received an e-mail that included an application.  The email's subject line mentioned "Sam's Club Merchant Services".

102.     The caller ID that appeared on the call was (402) 938-1722.

103.     (402) 938-1722 was not then a working number.

104.     Mr. Fabricant is not a customer of any of Defendants and has not consented to receive their telemarketing.

**G.      Defendants' Autodialing**

105.     The distinctive click and pause are a telltale sign of a predictive dialer.

106.     The click and pause reflected the algorithm of the predictive dialer operating.

107.     Predictive dialers dial thousands of numbers at once, and only transfer each call to a live agent once a human being is on the other end.

108.     As a result, the telemarketer shifts the burden of wasted time from itself to the calls' recipients.

109.     A predictive dialer is an ATDS.

110.     Some of Defendants' marketing strategies involve an ATDS.

111.    Defendants use equipment that has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically.

**H.    The Invasion of Privacy Caused by Defendants' Automated Telemarketing**

112.    The conduct alleged herein:

a.      invaded Plaintiffs' and proposed class members' privacy and solitude;

b.      interrupted Plaintiffs' and proposed class members' train of thought;

c.      wasted Plaintiffs' and proposed class members' time;

d.      annoyed Plaintiffs and proposed class members;

e.      harassed Plaintiffs and proposed class members;

f.      consumed the battery life of Plaintiffs' and proposed class members' cellular telephones;

g.      induced in proposed class members surges of the stress hormone cortisol, resulting in elevated heart rates, sweaty hands, tightened muscles, and anxiety; and

h.      cost some proposed class members money, either outright or in the form of spent minutes in a limited-minute monthly cellular service contract.

**I.    First Data, Sam's Club Merchant Services, and National Payment Systems Are Vicariously Liable for One Connect's TCPA Violations**

113.    For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

114.    In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for TCPA violations from the call.

115.    The FCC has instructed that sellers may not avoid liability by outsourcing telemarketing to third parties, warning that

> allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for

telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnotes and alteration marks omitted).

116.    The FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

117.    First Data, Sam's Club Merchant Services, and National Payment Systems are vicariously liable for One Connect's TCPA violations.

118.    First Data and Sam's Club Merchant Services hired National Payment, which used One Connect Processing to originate new business using automated telemarketing calls.

119.    First Data and Sam's Club Merchant Services could have restricted National Payment, and the third parties it worked with, from using automated telemarketing, but didn't.

120.    First Data and Sam's Club Merchant Services knew or reasonably should have known that National Payment and One Connect Processing were violating the TCPA on their behalf but failed to take effective steps within their power to force them to cease that conduct.

121.    A reasonable seller that accepts automated telemarketing call leads from lead generators would, and indeed must, investigate to ensure that those calls were made in compliance with the TCPA and regulations promulgated under it.

122.    In fact, despite the filing of the *Cooley* action, National Payment Systems and One Connect continue to violate the TCPA on behalf of First Data and Sam's Club Merchant

Services, as exemplified by the telemarketing robocalls to Mr. Floyd after First Data had been served with process in *Cooley* and the telemarketing robocall to Mr. Fabricant more than six months after *Cooley*'s commencement.

123.    One Connect had the ability to bind First Data and Sam's Club Merchant Services in contract, as it tried to do with Plaintiffs.

124.    The application that One Connect distributed on First Data's behalf "is stamped with First Data's trademarks and identifies First Data as the drafter of at least some portions of the application." Opinion and Order at 10, *Cooley v. First Data Merchant Servs., LLC*, Case No. 1:19-cv-01185-TWT (N.D. Ga. Nov. 15, 2019), ECF No. 59.

125.    "It contains detailed information regarding First Data's services, fees, and pricing." *Id.*

126.    "The cover letter to the Merchant Application supports the inference that One Connect has the authority to vary the terms of the Merchant Application by waiving certain fees—or, in the alternative, that First Data itself authorized One Connect to waive the fees." *Id.*

127.    "A prospective customer receiving One Connect's call and follow-up email could reasonably have assumed that One Connect was hawking First Data's services because it was acting as First Data's authorized agent." *Id.*

128.    "As First Data insist[ed] throughout its briefing [in *Cooley*], the Marketing Agreement requires third-party telemarketers hired by National Payment Systems to comply with the terms of the Marketing Agreement." *Id.* at 11.

129.    "This is significant because the Marketing Agreement ostensibly permits First Data to exercise significant control over the marketing activities of National Payment Systems, and, by extension, One Connect." *Id.*

130.    "For example, the Marketing Agreement stipulates that the nature and content of all marketing communications and promotional materials shall be approved by First Data." *Id.* (alteration marks and internal quotation marks omitted).

131.    "First Data also has the right under the marketing agreement to inspect National Payment Systems' place of business to conduct financial and procedural audits and make copies

of National Payment Systems' books, accounts, records and files pertaining to National Payment Systems' performance of services hereunder." *Id.* at 11-12 (alteration marks and internal quotation marks omitted).

132.    "These and other provisions strongly suggest that First Data intended to be intimately involved in the marketing of its services and that it was fully capable of exercising ongoing control over the entities conducting marketing on its behalf." *Id.* at 12.

133.    Called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. at 6592-93 ¶ 46.  Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

## V.    CLASS ACTION ALLEGATIONS

134.    Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), Plaintiffs bring this case on behalf of a class defined as follows: All persons in the United States to whom:

        a.     one or more calls (including text messages) were made;

        b.     to a cellular telephone number;

        c.     that could have promoted First Data's or Sam's Club Merchant Services' goods or services;

        d.     using a dialing system the same as or similar to that used to call any of Plaintiffs and/or an artificial or prerecorded voice;

        e.     between the date four years before the filing of the original complaint in this case and the first day of trial.

Notwithstanding anything herein to the contrary, excluded from the class are Defendants, any entity in which any of Defendants has a controlling interest or that has a controlling interest in any of Defendants, Defendants' legal representatives, assignees, and successors, the judges to whom this case is assigned and the employees and immediate family members of all of the foregoing.

135. Plaintiffs are members and proposed representatives of the class.

136. The class is identifiable through phone records and phone number databases.

137. The class is so numerous that joinder of all its members is impracticable.

138. The class numbers in the thousands, or more.

139. Sending a robocall costs less than one cent.

140. Defendants could afford to, and did, send thousands of robocalls.

141. Outcome-determinative questions of fact and law have the same answers for all class members. These questions and answers include but are not limited to the following:

      a.    Was the class member called at a cellular telephone number?  (Yes.)

      b.    Was the class member called using an ATDS and/or an artificial or prerecorded voice?  (Yes.)

      c.    Was the purpose of the call to the class member telemarketing?  (Yes.)

      d.    Was the call to the class member necessitated by an emergency?  (No.)

      e.    Was the class member called on one or more dates such that the class member had a TCPA claim that was not time-barred on the date that the original complaint in this action was filed?  (Yes.)

      f.    Had the class member provided prior express written consent before being called?  (No.)

      g.    What are the minimum statutory damages per violation the class member is entitled to?  ($500.)

      h.    Were the violations of the class member's rights under the TCPA knowing or willful?  (Yes.)

      i.    How much in statutory damages per violation should the Court award the class member?  ($1,500.)

      j.    Should Defendants be enjoined?  (Yes.)

142. The foregoing common issues predominate over any individual issues, making a class action the superior means of resolution.  Adjudication of these common issues in a single action has important advantages, including judicial economy, efficiency for class members, and

classwide *res judicata* for Defendants. Classwide relief is essential to compel Defendants to comply with the TCPA.

143.     Plaintiffs' claims are typical of the claims of the class.  Plaintiffs' claims and those of the class arise out of the same automated telemarketing by Defendants and seek the same legal and equitable remedies.

144.     Plaintiffs will fairly and adequately protect the interests of the class.

145.     Plaintiffs have retained competent and capable counsel experienced in TCPA class action litigation.

146.     Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the class and have the financial resources to do so.

147.     The interests of Plaintiffs and their counsel are aligned with those of the proposed class.

148.     For every 18 million robocalls, there's only one TCPA lawsuit in federal court. *Compare* Mike Snider, *Robocalls Rang up a New High in 2019. Two or More Daily Is Average in Some States*, USA Today (Jan. 15, 2020), https://www.usatoday.com/story/tech/2020/01/15/robocalls-americans-got-58-5-billion-2019/4476018002/ (58.5 billion robocalls); *with* WebRecon, *WebRecon Stats for Dec 2019 and Year in Review: How Did Your Favorite Statutes Fare?*, https://webrecon.com/webrecon-stats-for-dec-2019-and-year-in-review-how-did-your-favorite-statutes-fare/ (last visited Mar. 25, 2020) (3,267 TCPA complaints).

149.     The interest of individual members of the class in individually controlling the prosecution of separate claims against Defendants is small because the damages in an individual action are dwarfed by the cost of prosecution.

150.     The forum is a desirable, efficient location in which to resolve the dispute.  Mr. Floyd lives in the forum.  The forum is on the cutting edge of managing class actions.  The forum's district and magistrate judges have experience in managing TCPA class actions, including merits, class certification, discovery, ADR, and trial.

151.    No significant difficulty is anticipated in the management of this case as a class action.  Management of the claims at issue is likely to present significantly fewer difficulties than are presented in many class actions because the calls at issue are automated (and thus uniform) and because the TCPA articulates bright-line standards for liability and damages.

152.    Defendants have acted on grounds generally applicable to the class, thereby making final injunctive relief and corresponding declaratory relief appropriate on a classwide basis.

## VI.    FIRST CLAIM FOR RELIEF
### (Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)) On Behalf of Plaintiffs and the Class

153.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

154.    Defendants and/or their affiliates or agents violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls to the cellular telephone numbers of Plaintiffs and members of the class using an ATDS and/or artificial or prerecorded voice.

155.    Plaintiffs and class members are entitled to an award of up to $1,500 in damages for each knowing or willful violation and of $500 for each other violation.  47 U.S.C. § 227(b)(3).

156.    Plaintiffs and class members are entitled to and seek an injunction prohibiting Defendants and all other persons who are in active concert or participation with them from violating the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls to any cellular telephone number using an ATDS and/or artificial or prerecorded voice.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of all class members, pray for judgment against Defendants as follows:

A.    Certification of the proposed class;

B.    Appointment of Plaintiffs as representatives of the class;

C.    Appointment of the undersigned counsel as counsel for the class;

1   D.      A declaration that actions complained of herein violate the TCPA;

2   E.      An order enjoining Defendants and all other persons who are in active concert or

3   participation with them from engaging in the conduct set forth herein;

4   F.      An award to Plaintiffs and the class of damages, as allowed by law;

5   G.      An award to Plaintiffs and the class of costs and attorneys' fees, as allowed by

6   law, equity and/or California Code of Civil Procedure section 1021.5;

7   H.      Leave to amend this complaint to conform to the evidence presented at trial; and

8   I.      Orders granting such other and further relief as the Court deems necessary, just,

9   and proper.

## VIII.   DEMAND FOR JURY

Plaintiffs demand a trial by jury for all issues so triable.

## IX.    SIGNATURE ATTESTATION

The CM/ECF user filing this paper attests that concurrence in its filing has been obtained from its other signatories.

RESPECTFULLY SUBMITTED AND DATED on March 30, 2020.

By: /s/ *Jon B. Fougner*
Jon B. Fougner

Edward A. Broderick, *Pro Hac Vice Forthcoming*
ted@broderick-law.com
BRODERICK LAW, P.C.
99 High Street, Suite 304
Boston, Massachusetts 02110
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

Andrew W. Heidarpour, *Pro Hac Vice Forthcoming*
aheidarpour@hlfirm.com
HEIDARPOUR LAW FIRM, PPC
1300 Pennsylvania Avenue NW, 190-318
Washington, DC 20004
Telephone: (202) 234-2727

Matthew P. McCue, *Pro Hac Vice Forthcoming*
mmccue@massattorneys.net
THE LAW OFFICE OF MATTHEW P. McCUE
1 South Avenue, Suite 3
Natick, Massachusetts 01760
Telephone: (508) 655-1415
Facsimile: (508) 319-3077

Anthony I. Paronich, *Pro Hac Vice Forthcoming*
anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043
Telephone: (617) 485-0018
Facsimile: (508) 318-8100

*Attorneys for Plaintiffs Louis Floyd and Terry Fabricant and the Proposed Class*